IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

STEPHANIE MILLER, JAMES STELLHORN,
and HARLAN, LLC,

        Plaintiffs,      OPINION AND ORDER

 v.

                   10-cv-221-wmc

CITY OF MONONA, MARK DAVIS,
DAVID NETTUM, TONY FOCKLER,
PAUL KACHELMEIER, and ROBB KAHL,

        Defendants.

In this civil action under 42 U.S.C. § 1983, plaintiffs Stephanie Miller, James Stellhorn and Harlan, LLC contend that the defendants discriminated against their condominium development because Miller was a female, violating their right to equal protection under the Fourteenth Amendment. Plaintiffs' also contend that defendant Mark Davis unreasonably searched their properties in violation of plaintiffs' Fourth Amendment rights. Defendants have filed three separate motions for summary judgment (dkts. ##65, 71, 76).[1]

The court will grant defendants' motions for summary judgment on plaintiffs' equal protection claims. Although the City of Monona and its inspectors were zealous in their application of the building codes to plaintiffs' property, plaintiffs have cited no evidence from which a reasonable jury could infer that defendants discriminated against Miller *on the basis of her sex*. The court will, however, deny defendant Davis's motion for

---

[1] Plaintiffs also filed a motion to dismiss their equal protection claims against defendant Fockler (dkt. #93), which will be granted.

summary judgment on the Fourth Amendment claims, because there is a disputed issue of fact as to whether his search was authorized by consent or by regulatory scheme.[2]

UNDISPUTED FACTS[3]

## A. The Parties

Plaintiffs Stephanie Miller and James Stellhorn are married. Together, they own and operate plaintiff Harlan, LLC, a Wisconsin limited liability corporation.[4] Stephanie Miller was Harlan's managing partner and, in 2006, was listed as its registered agent. Typically, she acted as Harlan's spokesperson and handled most of its communications.

Defendant City of Monona is a near suburb of Madison, Wisconsin, abutting Lake Monona. At all relevant times, defendant Robb Kahl was the mayor of Monona and a member of its Plan Commission. Defendant Paul Kachelmeier has served as Monona's Planning and Community Development Coordinator for 22 years. When acting as one, the court will refer to Monona, Kahl and Kachelmeier collectively as "the

---

[2] There appears some confusion about whether Independent Inspections, Ltd. is still a defendant. In an order entered March 31, 2011, the court dismissed Independent Inspections, Ltd, because plaintiff had not alleged its personal involvement. (Dkt. #44.) The caption of the third amendment complaint (dkt. #48), however, still lists Independent Inspections as a defendant (as does the court's docket). The parties' summary judgment briefs do not mention Independent Inspections, nor did Independent Inspections file a motion for summary judgment. Moreover, the third amended complaint appears to contain no new allegations against Independent Inspections that would overcome the court's prior dismissal. Accordingly, the clerk of court *and* the parties will remove Independent Inspections from the caption going forward in this court.

[3] Except where noted, the following undisputed facts are taken from the parties' proposed findings of fact. Defendant Davis did not file a response to plaintiff's supplemental proposed findings of fact, so all of the facts relevant to the claims against him are deemed undisputed for purposes of his motion for summary judgment.

[4] Miller and Stellhorn each own 49% in Harlon; Millers' son, Jesse Miller, owns the remaining 2% interest. (Plts.' Resp. to Davis' PFOF (dkt. #96) ¶ 32.)

City Defendants."

Working under the city administrator, Kachelmeier coordinates overall city planning, zoning, and community development programs. Among other things, he deals with the public, consultants, and city officials on development issues, which includes assisting property owners and their contractors by reviewing site plans, specifications, structure and uses for zoning code and master plan compliance. Kachelmeier also serves as staff for the City of Monona Plan Commission and the Community Development Authority, providing technical support.

Defendants David Nettum and Tony Fockler were employees of Independent Inspections, Ltd., an independent contractor hired by the city to perform building inspection services. Nettum served as a "code enforcement officer" for the City of Monona from July 2005 until November 2006. A code enforcement officer had authority to issue citations for violations of Monona municipal ordinances relating to property maintenance. Fockler was the main inspector for Independent Inspections.

Defendant Mark Davis was employed by the Wisconsin Department of Natural Resources ("DNR") as the asbestos program coordinator and as an "air management specialist advanced" in the Bureau of Air Management. As the asbestos program coordinator from July 2001 until January 2007, Davis was responsible for implementing and enforcing federal and state asbestos regulations.

## B. Millers' Property and Proposed Condominium Development

In December 1999, plaintiffs Miller and Stellhorn purchased property located at 4113 Monona Drive, in the City of Monona, Wisconsin. The property had a single-

family house on it, but they purchased the lot to build a condominium. In December 2004, they caused Harlan to purchase the adjacent property located at 4111 Monona Drive, so that Miller could purse her condominium project. This property also had a single-family residence, which had been vacant for 4-5 years. The prior owner had begun remodeling, but the house's condition was "pretty crude," with no floor coverings, some missing drywall and no kitchen. Together, the two properties comprise .54 acres.[5]

In August 2005, Miller submitted plans to the City of Monona Plan Commission for an 11-unit condominium development on these properties. (Miller had previously discussed plans with the City for four units on one lot.) Miller had no prior experience developing property for condominiums or apartments, though Stellhorn and she own dozens of properties and have been in the real estate business for decades. Through a company called Stellhorn Investments, they own and manage fifty residential properties. Miller is also a licensed real estate broker and owns a business called Home Realty.

The Plan Commission discussed and analyzed Miller's plans with her and her representatives during commission meetings on August 8 and September 26, 2005, and on January 23, May 8 and May 22, 2006. Defendant Kachelmeier attended all the Plan Commission meetings at which Miller's proposals were presented and considered. Either an assistant or Miller took notes and drafted detailed minutes, which the commission reviewed and approved, so that city staff and applicants knew the commissioner's specific concerns, as well as whether and why the plans did not meet zoning standards. City staff

---

[5] The city defendants proposed conflicting facts about the size of the property. (City Defs.' PFOF (dkt. #67) ¶¶ 38, 91.) The court will assume the size that most favors plaintiffs as the non-moving party.

also send letters to applicants like the plaintiffs and their architects, including copies of the minutes to assist them in responding to the commission's comments and requests.

At each meeting, the commission members offered Miller extensive analysis and feedback. The commissioners expressed concern with the footprint size, mass, height and setbacks of Miller's proposed development, along with many other issues. For example, during the August 8, 2005, meeting, commissioners discussed issues of setback, proximity to the shoreline, building size and height for the lot and its location in relation to the adjacent park and nearby properties. Plaintiffs' architects revised the plans and presented them to the Plan Commission again on September 26, 2005. At that meeting, the commissioners raised similar concerns.

After the September 26, 2005 meeting, Miller's architect sent Kachelmeier a letter with revised plans that reduced the number of units from 11 to 10. The idea to reduce the number of units came from plaintiffs' architect, not defendants. Neither Kachelmeier nor the Plan Commission ever expressed concerns about the number of units or told Miller that she had to reduce the number of units.

The Plan Commission and city staff continued to review Miller's plans, placing them on the agenda each time they were submitted. Progress on Miller's proposal stalled during winter and spring of 2006, while she negotiated with Richard Litchfeld about expanding the project to include his adjacent property. (Litchfeld was the mayor of Monona before Kahl.) After the negotiations failed, Litchfeld opposed Miller's project before the commission.

Almost every member of the Plan Commission offered detailed feedback and constructive comments on Miller's plans at the meetings. For example, at the May 22, 2006, meeting, various members suggested stepping the floors back to help reduce the visual mass of the building and reducing the overall width of the side yards to allow for a better view of the lake.

In addition, Kahl and city staff met with Miller and her consultants numerous times. Kachelmeier had some personal contact with Miller, but most of his and the city staff's contact regarding her property was with her architects, builders and other professionals she employed. Kahl never told Miller that he did not like her plans, nor did he recommend the Plan Commission not approve them. From 1999, when Miller first submitted plans for the development to the city, until May of 2006, city staff spent well over a hundred hours reviewing her plans.

Between July and October of 2006, Stephanie Miller was in and out of the hospital for serious heart problems. During this time, she had little involvement with the properties. Stellhorn and Jessie Miller were managing them and keeping her informed about what was happening. (Plts.' Resp. to Davis' PFOF (dkt. #98) ¶ 34.) From August 2005 through May 2012, Jessie Miller had power of attorney for Stephanie Miller and could exercise her power as managing partner in Harlan. (Plts.' Resp. to Nettum's PFOF (dkt. #96) ¶ 33.)

## C. Defendant Davis' Asbestos Inspections

On January 10, 2006, an inspection of the 4111 and 4113 Monona Drive properties concluded that both buildings contained asbestos material that had to be

removed by state-certified asbestos workers before demolition. Rather than call professionals, plaintiffs attempted to remove the asbestos on their own.

After receiving a report that plaintiffs were removing asbestos containing material improperly, defendant Davis conducted a site inspection of the properties on July 6, 2006. Davis's typical practice is to enter a private property only with the consent of the owner or agent of the owner. When he found no one present onsite, he left business cards clipped to a mailbox and on a "Clayton Enterprises excavator" parked next to one of the houses. Seeking more information, he called the Building Inspection Department, which gave him contact information for the site's general contractors, who in turn gave him contact information for Stephanie Miller.

On July 7, 2006, Davis returned to the site and encountered an individual removing material that he suspected contained asbestos in a manner that did not comply with the DNR's asbestos regulations. This person gave Davis his consent to be present on the property and did not object or ask him to leave. Davis asked this person to stop work voluntarily, which he did.[6]

Later that same day, Davis sent a fax to Stephanie Miller directing her to stop work. In the fax, he said that the material must be removed by certified asbestos workers and no further asbestos removal or demolition would be allowed until she submits a plan with the DNR. Along with the fax, Davis sent a copy of the DNR's rules regarding asbestos removal.

---

[6] At this point, the identity of this person still remains unclear. Davis avers that he believed the person was Miller's husband; Stellhorn avers that he was not present; and plaintiffs argue it was "patently incredible" that an asbestos inspector would *not* ask the name of the person whom he believed was removing asbestos illegally.

Davis also believed violations of the air rules were occurring and directed Miller to stop the work because of the potential for additional carcinogenic material becoming airborne and exposing persons downwind. Davis also could have issued a Notice of Violation after conducting his first investigation, because the manner of demolition violated the Wisconsin Administrative Code. This could have resulted in citations or referral for prosecution, but Davis chose instead to allow Miller time to remedy the violations.

Davis learned later that Miller had hired Dirty Ducts to perform the asbestos removal and Clayton Enterprises to perform the demolition of the properties. Around July 26, 2006, Dirty Ducts submitted a Notification of Renovation and/or Demolition to the DNR, which is required prior to any asbestos removal. Although the DNR usually requires a ten-day waiting period to avoid asbestos contamination on the site from the prior work, Davis gave Dirty Ducts permission to proceed with the asbestos removal immediately. At the invitation of Dirty Ducts, Davis completed another inspection and approved the asbestos removal in early August 2006.

Plaintiffs' contractor later found additional suspect vermiculite, so Davis visited the properties again in mid-August 2006 for testing. Ultimately, Davis approved the removal of that asbestos as well.

## D. Building Code Inspections and Citations

Defendant Nettum, a "code enforcement officer," first noticed the 4111 and 4113 Monona Drive properties in the summer of 2005. At that time, he noted some windows had been removed and boarded over. After speaking with Kachelmeier -- who informed

Nettum that a condominium project was planned for the lots -- Nettum chose to take no further action at the time.

In June 2006, Nettum received complaints about the properties and visited them for the first time. Both properties had been vacant for more than a year and were in a dilapidated condition. Stellhorn and Jesse Miller had removed some windows and doors from one of the houses. Some siding from the house at 4113 Monona Drive had been taken off to remove asbestos. On July 3, 2006, Nettum saw someone with a truck backed up to the house at 4111 Monona Drive.

Nettum spoke with plaintiffs' attorney and informed him that a raze permit would be needed if the houses were to be demolished. On July 6, 2006, Miller submitted a Wisconsin Uniform Permit Application to demolish the houses at 4111 and 4113. (Fockler Decl. ¶ 3, Ex. A.) The application lists only Miller as the properties' owner. Miller's contractor filled out the application, but she signed it under the section titled "Owner's name." (S. Miller Dep. (dkt. # 62) 59, 60.) By signing the application, she "certifie[d] that all of the above information is accurate" and agreed to comply with the Municipal Ordinances. Fockler approved the permit.

On July 17, 2006, Nettum issued two citations to Stephanie Miller relating to the 4111 and 4113 Monona Drive properties for (1) "demolition without a permit" and (2) "causing a public nuisance" each day the violation continued. Nettum came to Miller's residence in person with a police officer and handed the citations to Miller. Plaintiffs claim Nettum laughed and smirked as he wrote out and served the citations, although Nettum denies this. (Plts.' Resp. to Nettum's PFOF (dkt. #107) ¶ 47; Nettum's Resp. to

Plts.' Suppl. PFOF (dkt. #106) ¶ 48.)

Nettum testified that he wrote the public nuisance citation because the buildings were open and there was debris on the property. He never discussed these issues with Miller or her attorney before issuing the July 17 citations. Based on his recollection and his daily log of his building inspection activities (in which he recorded other visits to plaintiffs' properties), Nettum did not visit plaintiffs' properties between the time Miller took out the raze application and he issued the public nuisance citation.

**E. July 21st Compliance Inspection**

On July 21, 2006, Nettum and Fockler performed a compliance inspection at the 4111 and 4113 Monona Drive properties.[7] They took pictures outside and inside of the vacant property. On July 26th, Nettum sent Miller a letter ordering her to build a fence on her properties. (S. Miller Decl. (dkt. #99-3).) In the letter, he states that the open property allowed anyone to access the partially demolished houses, which posed hazards including nails and open holes in the floor and the foundation. The letter cites no legal authority for the order to build the fence.

Before issuing this letter, Nettum attempted to call Miller and spoke with her attorney. On or about August 4, 2006, Nettum served Miller with a condemnation report, including pictures of the interior of the properties. Plaintiffs completed

---

[7] The parties dispute whether Nettum tried to contact Miller to schedule the compliance inspection. Nettum states that he made several attempts to contact Miller (Nettum Decl. (dkt. #80) ¶ 5), but Miller states that she recalls no phone calls, voicemails or letters from Nettum prior to July 21, 2006. (Miller Decl. (dkt. #99) ¶ 5.)

demolition of the houses by August 25, 2006.[8]

## F. Garage Demolition and October 9th Citations

On October 3, 2006, Nettum returned to plaintiffs' properties to perform another inspection. At that time, the garage on the 4113 Monona Drive lot was still standing and was structurally sound. After consulting with Fockler and the city administrator, Nettum concluded the garage was required to be removed because it was no longer useful for the properties' intended use. On October 9th, he issued two more citations to Stephanie Miller, one for each lot, for failing to raze the property correctly, as required by Monona Code of Ordinances Sec. 15-1-83.[9] Miller was cited for (1) not removing the garage, (2) not removing "debris," including a pier, boat hoist and shore station, (3) not

---

[8] On August 3, 2006, Ray Norton of Independent Inspections, one of Nettum's supervisors, wrote an e-mail about the plaintiffs' properties to Mayor Kahl and City Administrator. In the email, Norton states that, after their meeting the day before, he redirected the efforts of the code compliance officer (Nettum) and ordered the building inspectors to give him twice-daily updates on the properties. He also said, "We will keep close track of the deadlines of 7 days for the fence and the 30 days for the buildings being razed," and noting that if "the properties [are] found in non-compliance the day following the deadline, we will begin enforcement action." Norton also stated that "[w]e have the ownership details of these 2 buildings figured out. The assessor, the County and the Title Company records are conflicting, and it took some research to determine precisely who or what entity is an owner." Further complicating the relevance of this e-mail, the City Defendants admitted the basic facts in this paragraph (City Def. Resp. to Plts. PFOF (dkt. #102) ¶¶ 64-67), but Nettum objected correctly that the email is hearsay and not properly authenticated. (Nettum's Resp. to Plts.' PFOF (dkt. #102) ¶¶ 64-67.) The document is introduced by an affidavit from Miller (Miller Decl. (dkt. #99) ¶ 9), but she lacks personal knowledge about the veracity of the email or its contents. She avers that it was "produced to me by representatives of the City of Monona either in the course of responses to my public records act requests or otherwise," but she does not specify which defendant produced this email or when, nor does the document contain a Bates stamp indicating who produced it.

[9] In pertinent part, the Monona Code of Ordinances Sec. 15-1-83 provides: (1) all work must be "completed within thirty (30) days from the date of commencement;" (2) "all debris and materials resulting from such demolition shall be removed from the premises, all basements of other excavations or depressions revealed or caused by such demolition shall be filled to the general grade of the premises, and all surfacing on such premises shall be removed unless intended to be used in connection with the proposed use of the premises"; and (3) "[a]ll appurtenant structures on the premises no longer useful for the intended use of the premises shall likewise be razed or demolished and the resulting debris removed from the premises."

removing one of two driveways, and (4) not properly grading the lot. Two days later, plaintiffs obtained a raze permit for the garage, which they removed on October 19, 2006.

Nettum issued all of the citations between July and October of 2006 to Stephanie Miller, at least some of which were issued after he learned that Stellhorn was involved with Miller in the ownership of 4113 and that their company, Harlan, LLC, owned 4111 Monona Drive. Yet he never issued any citations to Harlan or Stellhorn. At some point, Nettum checked the AccessDane website, from which he received most of his information, and a performed a title check to see who owned 4111 and 4113 Monona Drive. By late summer, Nettum knew the actual ownership structure for each property.[10]

When asked at the municipal trial why he issued the citations for 4111 Monona Drive to Miller and not to Harlan, LLC, Nettum stated that Miller was part of Harlan. At his deposition, Nettum also justified citing Miller: "Because that's . . . the contact information that I had." (Nettum Dep. (dkt. #91) 39:18-25.) Later in his deposition, Nettum testified that it was "[p]robably because of what Kachelmeier told me and her name being on the top of the list." (*Id.* at 44.)

In October 2006, Nettum contacted the builders to take care of final issues. On October 25th, he completed his final inspection and concluded that plaintiffs completed the razing satisfactorily. All told, Nettum inspected the 4111 and 4113 Monona Drive properties three times: on July 21, October 3 and October 25, 2006. He did not obtain permission or a warrant to enter the properties before any of these visits.

---

[10] Nettum believes he checked the ownership before issuing the July 17, 2006, citations and knows he did so before issuing the October 9th citations.

Neither defendant Kachelmeier, nor the Planning Department nor the Plan Commission, played any role in deciding whether to issue the citations. The City of Monona Building Inspection Department is separate from the Planning Department. As Planning and Community Development Coordinator, Kachelmeier has no supervisory authority over the Building Inspections Department. Finally, Kachelmeier did not ask nor tell any building inspectors to write citations to Miller, and the inspectors did not ask him whether to issue the citations.[11]

## G. City of Monona's Standard Practice for Building Code Citations

At the request of the Plan Commission, Nettum wrote a memorandum dated November 8, 2006, explaining his typical practice for building inspections. The procedures described were in effect throughout the time Nettum was dealing with the plaintiffs' properties. In summary, the general practice was to (1) give property owners a warning if they were not in compliance with building codes, (2) allow time for compliance and (3) not issue citations if the owners complied voluntary. In full, Nettum wrote that his general policy was:

> Item #1: All compliance requests need to be in writing. Some complaints are made in writing, most are made by phone and by visual inspection when patrolling.
>
> Item #2: Perform field inspection. Make personal contact by telephone or in person and explain issues and time frames to make correction.

---

[11] Though the Inspection and Planning Departments act separately, they do coordinate efforts in some respects. For example, Kachelmeier told commissioners at the May 22, 2005, meeting that he would contact the inspectors to ensure plaintiff had a demolition permit. Similarly, in August 2005, it was Coordinator Kachelmeier who informed Inspector Nettum that there was a condominium planned for the properties, which was under review by the city.

I always try to make personal contact with the property owner; however, in many cases a letter serves as the initial contact since the property owner is not home.

Item#3: If non-compliances are found, notification will be provided either by using a letter or by personal service giving the owner ten (ten), 15 (fifteen), or 30 (thirty), days to make corrections, depending on the nature of the non-compliance issue(s). Personal service includes 'filling out an affidavit of personal service. Depending on the nature of the violation, the time frame could be immediately for minor violations like signs and up to two weeks for major violations. I also take into consideration the property owners personal situation, which may be age, health or working out of town on a regular basis when considering a time frame for compliance.

Item #4: A follow-up inspection is done after the time limit expires. If the noncompliances are not corrected after the initial warning letter and time frame to gain compliance has lapsed, a citation will be issued. If 50% of the items have been corrected, an extension of half of the original time frame may be granted to complete the work.

If the property owner is making a continued effort to clean up the non-compliance issue, I will keep extending the time limit (within reason) until the property is in compliance. If I have trouble getting a property owner to comply, I issue citations.

Several attempts are [made] to deliver the citation; I turn it over to the Police Department to deliver.

Item #5: If the non-compliances are corrected, a thank you letter is sent closing out the file. [Independent Inspections] sends a letter of compliance thanking the property owner for bringing the property into compliance.

(Nettum's Resp. to Plts.' PFOF ¶ 12.)

If an owner applies for a permit after starting work, the permit fee is doubled. Monona Code § 15-1-24(a)(3). But no separate citation for beginning work without a permit is generally issued. On behalf of Independent Inspectors, Fockler's customary practice was (1) to achieve compliance by informal means and (2) to issue citations only

if the owner failed to comply. Fockler's practice when he sees someone beginning demolition without a permit is to (1) speak to him or her, (2) tell them to get a permit, and (3) issue a citation only if a permit is not obtained before completing the project. (Nettum's Resp. to Plts.' PFOF ¶¶ 14-15 (dkt. #106).)

Nettum testified at the municipal trial that he tried to contact Miller by phone and was usually directed to her attorney. Some of these communications occurred after the July 21, 2006, inspection, but some occurred before. (Plts.' PFOF (dkt. #95) ¶ 19.) At some point, Miller told Nettum to work only through her attorney. When Nettum was asked why he issued Miller the citation for beginning demolition without a permit – although by that time she had come into compliance by obtaining a permit – Nettum said he did not recall, nor could he recall any other razing permits during his time as a code enforcement officer. (*Id.* at ¶ 34-35.)

## H. City Refuses to Review Further Plans from Miller

After issuing the citations, the city adopted the position that it would not issue any permits or place any revised plans for plaintiffs' project on the commission's agenda until the citations were resolved. The city administrator instructed Kachelmeier not to do any further work on plaintiffs' project until all the citations had been cleared up. On September 20, 2006, Kachelmeier sent a letter to Miller's attorney stating:

> City Administrator David Berner has told me that until the site and property owner are in compliance with all City ordinances and all fines and citations have been resolved, City staff should not be reviewing plans for the proposed development, and once that occurred, new plans could be submitted for the City's review.

(Kachelmeier Aff. (dkt. #68) ¶ 35, Ex. J.)  Unless Kachelmeier received new instructions, he would not have processed revised plans submitted by the plaintiffs during this time.

In January of 2007, the inspectors determined the sites were in compliance with city ordinances.  Kahl then told Kachelmeier that he could review revised plans, but that no permits, specifically zoning permits, should be approved until all outstanding citations were resolved.  It would have cost Miller about $24,000 to pay off the citations and Miller never submitted any new revised plans.  Kachelmeier agreed that it did not make any sense for the plaintiffs to spend money on revised plans as long as the city was taking the position that it would not act on them.  Miller's proposed condominium project was on hold for nearly three years until the municipal judge issued a decision.

## I.  Hearing

A trial on the four citations was held before the Village of McFarland Municipal Court on October 16, 2007, November 7, 2007 and January 30, 2008.[12]  At the close of the trial, the court dismissed the citations for causing a public nuisance, because there was no evidence of a nuisance as of the date of the citation. Post-trial briefing was complete on the other citations by May 27, 2008, and the Municipal Court issued a written decision and order on February 27, 2009. (Municipal Court Order, Oslen Dec. (dkt. #98-A).)

The court determined that Miller violated the municipal ordinance by commencing demolition at both properties without a permit and ordered her "to pay a

---

[12] The record does not reflect why it took nearly three years for the municipal court to render a decision on the citations.  It is also unclear why citations for violations of Monona's municipal code were tried before the McFarland municipal court.

forfeiture and statutorily required penalty assessment . . . in the total amount of $671.00." (*Id.* at 12.)  It found Miller not guilty on the October 9, 2006, citations, concluding: (1) § 15-1-83(b)(4) did not require Miller to remove the garage, since the garage could be used for storage during construction and appurtenant structures were required to removed only if "no longer useful for the intended use of the premises" (*id.* at 8); (2) § 15-1-83(b)(4) did not require Miller to remove one of the driveways, since two lots could use two driveways and surfaces were not required to be removed if they were "intended to be used in connection with the proposed use of the premises," (*id.* at 9); (3) Miller did not violate § 15-1-83(b)(1) by leaving "debris . . . from such demolition" on the site, because "it is clear from the photographs and testimony that the debris referred to" by the city was the viable pier and shore station; and (4) the photographic evidence was not clear enough to determine whether the property was "filled to the general grade," as required by §15-1-83(b)(1).

The court also found that it was appropriate to issue the citations to Miller for any violations of the building code at her properties, because Monona Ordinance § 15-1-3(a) allowed the citation of "every owner of a building, every person in charge of or responsible for or who caused the construction, repair, or alteration of any building or structure."  The court also observed, however, that "it may have been appropriate to cite others in addition to Miller jointly and severally."

Miller argued to the municipal court that she was selectively prosecuted because of her disagreement with Litchfield, the former mayor.  In response, the court wrote:

> The evidence showed that there was a zealous effort to
> enforce compliance of the Building Code by the City of

Monona against Miller and that the City of Monona may have exceeded its authority. It is the conclusion of this Court that some of the efforts to enforce compliance were unreasonable (e.g., requirement that Miller remove the structurally sound garage, removal of access from both lots, the removal of pier components, requirement that a fence be constructed and the refusal to grant a zoning permit until all outstanding citations were resolved). The City of Monona has a procedure for appealing these types of unreasonable requests. Those appeals are not properly before this court.

(*Id.* at 11-12 (footnotes omitted).)

Although the order resolved Miller's citations, plaintiffs never submitted revised plans for review. The last plan plaintiffs submitted was the plan reviewed at the May 2006 plan commission meeting. Miller's project was never voted on by the Plan Commission and, therefore, never turned down. Miller gave up on her plans to develop 4111 and 4113 Monona Drive as condominiums in about 2010.

## J.  Kevin Metcalfe's Water Crest Condominium Development

Around the same time, Kevin Metcalfe proposed and ultimately built Water Crest Condominiums ("Water Crest"). The Plan Commission approved Metcalfe's plans in March 2006. Water Crest is a five-story development. As originally proposed, it had 45 units, though it was built with 42. Water Crest's units are smaller than the proposed units were in plaintiffs' plans. Units in Water Crest range from 1,010 to 1,976 square feet, with an average of 10 units on each floor. Miller proposal had units ranging from 1,520 to 2,658 square feet, as well as two, two-story penthouse units of 3,996 square feet and 4,392 square feet. Miller never designed or submitted plans for consideration by the city to be a "higher density" development, as Water Crest was.

Like plaintiffs' property, Water Crest is located on Monona Drive, on the shore of Lake Monona. Metcalfe's property is .81 acres and located approximately one half mile from plaintiffs' property, at the opposite ends of a continuous area zoned multi-family. The block around Water Crest is more densely developed. Multi-family condominium and apartment developments sit to its immediate north and south, and just to the east is a large commercial area along Cottage Grove Road.

In contrast, plaintiffs' property has a large condominium two lots to the north, a park to the south, and a retail center across the street. The rest of the area around plaintiffs' property is mostly single-family homes.

Water Crest fronts two streets on a corner lot abutting a high traffic intersection of Monona Drive and Cottage Grove Road. The intersection has a traffic signal, from which it has access. Plaintiffs' property is not a corner lot and does not have a signal. Neither development precisely met the city's setback standards, but Water Crest was closer to the city's setback standards than Miller's proposed development.

## PLAINTIFFS' MOTION TO DISMISS DEFENDANT FOCKLER

After defendants filed their motions for summary judgment, plaintiffs filed a motion to dismiss the claims against Fockler voluntarily under Fed. R. Civ. P. 41(a)(2), though the motion did not specify whether the dismissal should be with or without prejudice. Plaintiffs filed two amended complaints after serving Fockler and waited until after Fockler had filed his motion for summary judgment to move for dismissal. In their brief in opposition to the summary judgment motions, plaintiffs say nothing about

defendant Fockler. Since plaintiffs cannot avoid responding to his summary judgment motion by voluntarily dismissing and then refiling again at another date, the court will grant plaintiffs' motion to dismiss Fockler, but the dismissal will be with prejudice.

## MOTIONS FOR SUMMARY JUDGMENT

At summary judgment, the plaintiffs, as the non-moving parties, must "show through specific evidence that a triable issue of fact remains on issues for which [they] bear[] the burden of proof at trial. . . . [T]he evidence submitted in support of [their] position must be sufficiently strong that a jury could reasonably find for [them]." *Knight v. Wiseman*, 590 F.3d 458, 463-64 (7th Cir. 2009) (internal quotation omitted). "In resolving a summary judgment motion, [the court] draw[s] all reasonable inferences and resolve[s] factual disputes in favor of the non-moving party." *Id.* at 462.

### A. Fourth Amendment Claim against Defendant Davis

Plaintiffs allege that Davis violated their Fourth Amendment rights by entering their property without a warrant on July 7, 2006. Plaintiffs abandoned any Fourth Amendment claims based on Davis' other visits and any equal protection claims against Davis. (Opp. Br. (dkt. #94) 13.) Davis argues that (1) his July 7, 2006 inspection fell within the regulatory exception to the warrant requirement and (2) he obtained consent to enter the premises.

### 1. Regulatory Scheme Exception

Although the Fourth Amendment's prohibition on "unreasonable searches and seizures" protects commercial premises as well as a person's home, the expectation of

20

privacy is less and is "particularly attenuated in commercial property employed in 'closely regulated' industries." *New York v. Burger*, 482 U.S. 691, 699 (1987) (upholding warrantless, surprise inspections of vehicle dismantling business). The Supreme Court has explained that warrantless inspections of closely-regulated businesses may not violate the Fourth Amendment if: (1) the regulation of the industry is pervasive; (2) a substantial governmental interest justifies the regulatory scheme; (3) the warrantless inspections are necessary to further the scheme; and (4) the inspection program provides a constitutionally adequate substitute for a warrant. *Id.* at 702-03. *See also Lesser v. Espy*, 34 F.3d 1301, 1306 (7th Cir. 1994) (upholding surprise warrantless inspections of dealers of animals for scientific inspections).

Plaintiffs do not deny that demolition and construction are highly regulated industries; that Wisconsin has a substantial interest in preventing airborne contaminants like asbestos; or that warrantless inspections are necessary to further the asbestos regulation scheme. Rather, plaintiffs argue that Davis has not shown that his search was pursuant to a reasonable regulatory scheme because (1) Wis. Adm. Code § NR 447.01 did not authorize Davis to enter their property; and (2) Wis. Stat § 285.19 is not a constitutionally-adequate warrant substitute.

To provide an adequate warrant substitute, "the statute's inspection program must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers." *Burger*, 482 U.S. at 703. For the former requirement, the statute "must be sufficiently comprehensive and defined

that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.* (quoting *Donovan v. Dewey*, 452 U.S. at 600). For the latter, the inspections must be "carefully limited in time, place, and scope." *Id.* (quoting *U.S. v. Biswell*, 406 U.S. 311, 315 (1972)).

The statute approved by the Supreme Court in *Burger* gave vehicle dismantlers adequate notice by identifying the scope of the inspections, the identity of authorized inspectors and that inspections would occur regularly. 482 U.S. at 711. It also restrained the inspectors' discretion by limiting inspections to "regular and usual business hours"; defining the covered businesses; and restricting inspections to the statutorily required records and "any vehicles or parts of vehicles which are subject to the record keeping requirements." *Id.* at 711-712.

In *Lessor*, the Seventh Circuit approved a regulatory scheme for inspecting facilities that raise research animals. 34 F.3d at 1307-09. The statute limited the locations that could be searched, the purposes of the search and identified the authorized inspectors. *Id.* at 1308. Regulations issued by the Secretary of Agriculture detailed further the activities of the inspectors during searches, limiting their scope to what was necessary to assure compliance with the statute. *Id.* at 1309. Furthermore, although the statute provided that the Secretary of Agriculture could perform inspections "as he deems necessary" at "all reasonable times," 7 U.S.C. § 2146(a), the Secretary issued detailed regulations limiting inspections to regular business hours. *Id.* at 1308-09.

In this case, Davis points the court to one statutory provision, Wis. Stat. § 285.19, and one code provision, Wis. Adm. Code § DNR 447, but neither sets forth a

regulatory scheme similar to those approved of in *Burger* or *Lessor*. Wisconsin's air pollution control statutes authorize "any duly authorized officer, employee or representative" of the Department of Natural Resources to "enter and inspect any property, premises or place on or at which an air contaminant source is located . . . at any reasonable time for the purpose of ascertaining the state of compliance with this chapter . . . and rules promulgated or permits issued under this chapter." Wis. Stat. § 285.19. It further provides "[n]o person may refuse entry or access to any authorized representative of the department who requests entry for purposes of inspection, and who presents appropriate credentials." *Id.*

Pursuant to its statutory authority under Wis. Stat. § 285.11, the DNR promulgated asbestos rules in chapter NR 447 of the Wisconsin Administrative Code. This chapter is intended "to establish emission limitations for asbestos air contaminant sources, to establish procedures to be followed when working with asbestos materials and to create additional reporting and recordkeeping requirements for owners or operators of asbestos air contaminant sources in order to protect air quality." Wis. Adm. Code § NR 447.01. Chapter NR 447 is a comprehensive regulatory scheme for asbestos removal, clearly identifying the type of properties and activities that are subject to regulation and what procedures for removal must be followed. In relevant part, the rules require any owner who intends to demolish or renovate a "facility" to (1) perform pre-inspections to determine if asbestos is present, § NR 447.06; (2) notify the DNR of her intentions and provide detailed plans, § NR 447.07; and (3) follow specific procedures to limit asbestos emission, § NR 447.08.

Plaintiffs' first argue that the asbestos regulations do not apply to their demolition, because they were demolishing two single-family residences and the code expressly excludes from its coverage residential buildings with 4 or fewer units. This argument is problematic at best. The asbestos demolition regulations, § NR 447.06, and the inspections provision, § NR 439.05, apply to the "facilities." The code defines "facilities" as "any institutional, commercial, public, industrial or residential structure, installation or building . . . but excluding residential buildings having 4 or fewer dwelling units." Wis. Adm. Code § NR 447.02(14). Although plaintiffs' properties had less than four units, their demolition site fell under the code's definition of an "installation." An "installation" is "any building or structure or any group of buildings or structures at a single demolition or renovation site that are under the control of the same owner or operator, or owner or operator under common control." Wis. Adm. Code § NR 447.02(22).

Plaintiffs' property consisted of at least three buildings on a single site under the control of the same owners and operators. Plaintiffs' plan was to demolish the two houses and garage to construct an 11-unit condominium complex. Moreover, plaintiffs' reading has the illogical implication that asbestos regulations do not apply to any developer who is demolishing single-family residences, no matter how many houses are on its site.

Even so, Davis has failed to establish that Wis. Stat. § 285.19 and Wis. Adm. Code § NR 447 provide an adequate warrant substitute. Despite its numerous details, the court can find nothing in chapter NR 447 that even mentions warrantless inspections

of asbestos disposal.  Accordingly, chapter NR 447 provides property owners no notice that their demolitions are subject to routine inspections for asbestos without a warrant, nor does it carefully limit the discretion of the inspectors.[13]

Neither party cited any other administrative rules governing the inspections by DNR authorities.  The court's research uncovered one arguably applicable DNR rule: a general provision authorizing DNR inspections for air contaminants. Even this provision, however, states only that:

> No person may deny entry or access at any reasonable time to an authorized representative of the department for the purposes of inspection of facilities, equipment, including monitoring and air pollution control equipment, practices or operations regulated or required by the department, or at any time when an air pollution episode condition exists or is believed imminent. No person may obstruct, hamper or interfere with any inspection.

Wis. Adm. Code § NR 439.05(b).

This provision does not adequately limit a DNR inspectors' discretion, whether it be (1) the frequency of the inspections; (2) the reasons for initiating an inspection, or (3) the activities of the inspectors.  Although it appears at first glance to limit inspection to reasonable times (though without defining that term), it also authorizes inspections at "*any time* when an air pollution episode condition exists or is believed imminent," without defining "air pollution episode condition" or who decides when one is "believed imminent."  *Compare* chapter NR 447 *with* Wis. Adm. Code chapter DHS 159.[14]  It is

---

[13] Wis. Adm. Code § NR 447.19 defines enforcement options, including issuance of citations and penalties.  Section NR 436 sets limits for variances, exceptions or delayed compliance orders, and § NR 410.05 defines a fee schedule for permits and inspections.

[14] Chapter DHS 159 provides a detailed scheme for the Department of Health Services to certify, train and supervise individuals who remove asbestos.  They authorize a DHS representative to "enter at any

possible that the DNR has adopted procedures for asbestos inspections elsewhere in greater detail, but neither party cited them.

In the absence of further administrative guidance, Wis. Stat. § 285.19 cannot serve as an adequate warrant substitute for asbestos inspections. Although § 285.19 clearly authorizes warrantless entries, it provides few meaningful restrictions on *who* will be searched, the *time* of entry, the *justifications* for the entry, or the *purposes* of the search. Instead, it authorizes entry at any reasonable time and for ascertaining compliance with *any* portion of the vast air pollution chapter. Davis has not, therefore, shown that his inspection was performed pursuant to an inspection scheme that provides an adequate substitute for a warrant.

## 2. Consent

A warrantless entry and search of premises does not violate the Fourth Amendment if the official obtains consent of an occupant who has -- or who the official reasonably believes has -- authority to consent. *United States v. Matlock,* 415 U.S. 164 (1974). When the circumstances show that a person's authority to consent to a search is questionable, law enforcement officers have a duty to inquire further about whether he has authority to consent. *Illinois v. Rodriguez*, 497 U.S. 177, 188-89 (1990). The "determination of consent to enter must be judged against an objective standard: would

___

reasonable time any property in order to determine compliance with" the asbestos certification requirements, when the department "has reason to believe" that (1) "[a] person is violating or has violated any provision of" the asbestos removal certification provision;" (2) "[a] regulated asbestos activity is being or has been conducted"; or (3) "[a]sbestos waste or alleged asbestos waste is stored or disposed." *Id.* at § DHS 159.43(a). They further limit the kind of activities that DHS representative may engage in while on the property, such as conducting tests, interviewing or taking samples, *id.* at § DHS 159.43(c), and require the inspector to display identification and comply with all applicable health and safety laws. *Id.* at § DHS 159.43(d).

the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* at 188 (internal quotations and citations omitted).

In *Montville v. Lewis*, 87 F.3d 900 (7th Cir. 1996), the Seventh Circuit faced the question of how a duty of inquiry recognized in *Rodriguez* applies to administrative searches. *Id.* at 902-03. The defendants, who were building code inspectors, received permission to enter the plaintiff's home from a contractor who was performing renovations. The court, however, did not decide whether a contractor could give a valid third-party consent, whether it was reasonable for the inspectors to believe a contractor had such authority, or whether the inspectors had an obligation to inquire further into his authority. *Id.* at 902 ("Even assuming for the sake of argument that the contractor's consent was not valid, we cannot agree with the district court that the relevant law was clearly established at the time (or even now)."). Instead, the court held that the inspectors were entitled to qualified immunity, because "defendants reasonably could have believed that *Rodriguez*'s requirement of further inquiry did not apply to their administrative inspection of [the plaintiff's] house." *Id.* at 903. Since *Montville*, the Seventh Circuit has not had the opportunity to consider further the limitations on third-party consent in the administrative inspection context.

The facts surrounding Davis's inspection on July 7, 2006, remain at least somewhat unclear. On summary judgment, the court will assume that Stellhorn was not present. Defendants have not denied, however, that someone was on their property engaging in demolition on July 7, 2006, nor have they denied that this person consented

to Davis' entry. Davis argues that he reasonably believed that this person was Miller's husband and, thus, reasonably believed the person had authority to consent to his entry.[15]

Unfortunately, Davis did not propose any facts beyond this bare minimum. For example, what this person said to make Davis believe that he was Miller's husband or what else Davis did to ensure the person had authority to consent to his entry. Similarly, Davis's proposed facts strongly suggest, but do no establish, that there was sufficient evidence of asbestos removal on July 7th to justify his directing no further work be done that day. On such a minimal record, however, the court cannot find as a matter of law that Davis had authority to consent to his entry, nor that his direction to stop work was inevitable. Accordingly, the court will deny his motion for summary judgment on this basis.

However, depending upon additional, undisputed facts, there may well be no need to proceed to trial on this issue, because Davis is entitled to qualified immunity (Answer of Defendant Davis to Second Amended Complaint (dkt. #49), Affirmative Defense ¶2), the asbestos removal violation was in plain view or no compensable damages can be shown. The court will address this further with the parties during the telephonic status conference on Thursday, January 3, 2013 at 10:00 a.m.

---

[15] Davis speculates that the person might have been Jesse Miller, who would have had actual authority. Davis, however, presents no evidence to support this speculation, noting only that plaintiffs did not file a declaration from Jesse Miller. (Reply Br. (dkt. #109) 3.) Moreover, while Jesse Miller admitted in his deposition that he removed asbestos material from the house, he denied being on the property when Davis inspected it. (Dep. of J. Miller (dkt. #70) 36:25, 40:11-25.)

## B. Sexual Discrimination

Plaintiffs also allege that the City Defendants discriminated against Miller -- and indirectly again Harlan and Stellhorn -- all in violation of Equal Protection Clause of the Fourteenth Amendment because Miller was a female developer.

## 1. Standards for Proof of Discriminatory Intent

When pursuing an equal protection claim, a plaintiff may proceed under the direct or indirect method of proof. *Helland v. S. Bend Cmty. Sch.*, 93 F.3d 327, 329 (7th Cir. 1996). Under the direct method, a plaintiff must put forth "evidence leading *directly* to the conclusion that an [action] was illegally motivated, without reliance on speculation." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 676 (7th Cir. 2012) (emphasis in original). While the *evidence* may be direct or circumstantial, it must enable a finder of fact to infer discrimination "without relying on speculation." *Id.* at 677.

The familiar *McDonnell Douglas* burden-shifting analysis applies to the indirect method. *Everroad v. Scott Truck Sys., Inc.*, 604 F.3d 471, 477 (7th Cir. 2010) (applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) to gender discrimination). Under this method, a plaintiff must first establish a prima facie case of discrimination, which requires her to prove that: (1) she was a member of a protected class; (2) defendants treated her in an unfavorable manner; and (3) defendants treated a similarly situated person outside the protected class more favorably. *Lucas v. PyraMax Bank, FSB*, 539 F.3d 661, 666 (7th Cir. 2008). Whether a person is similarly situated is a "flexible" and "common-sense" inquiry, which "simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to

allow the type of comparison that, taken together with the other prima facie evidence, would allow a jury to reach an inference of discrimination or retaliation." *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 406 (7th Cir. 2007) *aff'd*, 553 U.S. 442 (2008).

"Once that prima facie case is met, the burden shifts to [the defendants] to produce evidence of a legitimate, nondiscriminatory reason for the action alleged to be discriminatory." *Radentz v. Marion Co.*, 640 F.3d 754, 757 (7th Cir. 2011). If the defendants "satisf[y] that burden of production, the plaintiffs must establish by a preponderance of the evidence that the proffered reasons for the alleged discriminatory action are pretextual." *Id.* The plaintiffs may show the reason was pretextual by "demonstrate[ing] that it had no basis in fact, it did not actually motivate the decision . . . or it was insufficient to motivate that decision." *Id.* (citing *Davis v. Wis. Dept. of Corr.*, 445 F.3d 971, 977 (7th Cir. 2006)). The focus is "not whether the defendants' decision was a wise one, but whether it was honestly believed." *Id.*

## 2. Alleged Sexual Discrimination by Defendant Nettum

Plaintiffs attempt to proceed against defendant Nettum under the direct and indirect method, contending that he discriminated against Miller on the basis of her sex when issuing the building code citations.

### a. Direct Method

Under the direct method, plaintiffs rely on three pieces of circumstantial evidence: (1) Nettum departed from the standard procedure; (2) he exhibited subjective ill-will; and (3) three of the four citations were unfounded. Even if true, however, none of this evidence points to gender discrimination.

First, plaintiffs admit Nettum had the authority to issue the citation, but argue that a jury could infer sexual discrimination based on Nettum's departures from his ordinarily lenient procedure. Nettum admits that his informal policy was to (1) issue a warning that they were not in compliance with building codes, (2) give them a specific number of days for compliance and (3) issue a citation only if they failed to voluntarily comply within that timeframe.

While the parties dispute whether Nettum's efforts were consistent with his informal policy, it is undisputed that Nettum issued the citation two weeks after Miller obtained the demolition permit. When asked why he did not allow plaintiff additional chances for compliance, Nettum answered that "I think it's just because of the buildings, the state of the buildings and nothing seemed to get done." (Nettum's Resp. to Plts. PFF ¶ 16 (citing Municipal Hearing Tr. (dkt. #83) 81.)) It is also undisputed that Nettum did not visit plaintiffs' property between warning Miller's lawyer and issuing the July citation. Furthermore, a reasonable jury could conclude that Nettum made few efforts toward achieving voluntary compliance. For example, although Nettum spoke with Miller's attorney, he did not send her the typical formal letter giving her a specific number of days to correct the violations before issuing the July citations.[16] Nettum maintains that he called, sent a letter, and sought formal compliance only after he did not receive a response, but Miller does not remember receiving any calls, messages or letters.

---

[16] The city defendants attempted to bolster this proposed finding of fact, and several others, with numerous additional facts that were not part of their proposed findings of fact. (City Defs.' Resp. to Plts.' Suppl. PFOF (dkt. #102) ¶ 16-20.) The court disregarded the new facts in defendants' reply.

Even if Nettum departed from his procedures, however, that does not point directly to discrimination on the basis of sex. The court of appeals has stated that substantial departures from official procedures can be circumstantial evidence of discriminatory motivation. *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) ("The systematic abandonment of its hiring policies is circumstantial evidence of discrimination."). Such procedural irregularities, however, are telling only if the outcome favored a person outside the protected group or persons outside the group did not receive similar treatment. *See id.* at 716-17, 723 (decision-maker bypassed committee to select minority candidate). Otherwise, the irregularity does not support an inference of discrimination on *the basis of the protected characteristics*, as opposed to any other reason good or bad. Plaintiffs offer no reason to suspect, other than pure speculation, that Nettum's uncharacteristically inflexible approach in their case suggests discrimination on the basis of sex.

Even if procedural irregularity alone were enough, Nettum's departures from the procedure were minimal. In the cases cited by plaintiffs, the defendants largely abandoned an official procedure for hiring and firing decisions. *See id.* (defendant "systematically" abandoned committee procedure to discuss and rank candidates); *Lewis*, 523 F.3d at 744 (employee fired without input from full school board, as required by stated policy). In contrast, plaintiffs admit that Nettum had the authority to cite plaintiff without a warning and that no official procedures prevented him from issuing a citation after the owner obtained a permit.

Plaintiffs proffer two pieces of evidence that the inspectors maintained an

informal policy of leniency.  They cite testimony from another inspector, Fockler, but he simply describes *his* policy, not *the* policy of independent inspections.  Next, plaintiffs point to the guidelines that Nettum presented to the Plan Commission, which he claims to have followed throughout the relevant period.  But this "policy" left Nettum with discretion to decide how much time and effort to put into voluntary compliance, based on a number of factors.  While Nettum acted here more quickly than his self-described policy would suggest, no reasonable fact-finder could infer from this that he acted on the basis of discriminatory animus, much less that he acted on the basis of Miller's sex.  *Good*, 673 F.3d at 677 ("Without some evidence from which we could reasonably infer that UCMC exercised its discretion to terminate Good rather than demote her *based on her race,* the fact that it deviated from a highly discretionary demotion policy, standing alone, is not probative of improper motivation.").

Plaintiffs' second piece of circumstantial evidence is that Nettum laughed and smirked while he issued the first citations.  This is really no evidence at all unless Nettum's apparent enjoyment was tied to evidence of a discriminatory origin.  Otherwise, the fact is immaterial because such generic ill-will does not suggest gender discrimination.

Finally, plaintiffs argue that three of the four citations were unfounded.  The Municipal Court found plaintiff guilty on one count and not guilty on the remaining three.  Although that court declined to rule on Miller's claim for selective enforcement for procedural reasons, it noted that several of Nettum's decisions were unreasonable: requiring her to tear down the structurally sound garage, remove the drive and pier and erect the fence.  However, this does not prove the other citations were so unfounded as

33

to infer a discriminatory intent. And even if it were enough to infer some sort of animus, it again does not point to discrimination *on the basis of sex*. Plaintiff cites *Geinosky v. City of Chicago*, 675 F.3d 743 (7th Cir. 2012), to suggest that subjective ill will alone can support an inference of discrimination. However, in *Geinosky*, the Seventh Circuit concluded that there was no conceivable purpose other than harassment for "twenty-four bogus parking tickets," *id.* at 748-49, while plaintiff was in fact found guilty of one of the citations. Moreover, *Geinosky* was a class-of-one case in which the plaintiff was not required to prove discrimination on the basis of class membership. *Id.* at 747.

### b. Indirect Method

Although plaintiffs' sex discrimination claim against Nettum fails under the direct method, they might still proceed under the indirect method by identifying a male developer who was involved in similar code violations and received more favorable treatment from Nettum. In a unique twist, plaintiffs identify only one comparator: Millers' co-owner and co-plaintiff Stellhorn. They argue that Stellhorn was an equal owner of the properties and of Harlan, LLC, as well as personally engaged in the demolition, yet Nettum issued the building code citations to Miller but not Stellhorn.

Even ignoring some tellingly weak proffers of proof discussed in footnotes, plaintiffs' suggested comparator puts their discrimination claim on the horns of a dilemma. For Stellhorn to be similarly situated to Miller, Nettum must have known that Stellhorn was a co-owner of Harlan, LLC and the 4113 Monona Dr. property and have chosen not to issue citations to him. If Nettum did not know Stellhorn was a co-owner, then his failure to issue the citation to Stellhorn was not differential treatment. Plaintiffs

attempt to avoid this horn by asserting on questionable proof that Nettum knew Stellhorn was a co-owner.[17]

Unfortunately for plaintiffs, this is where their claim is inevitably gored by the other horn. If Nettum *did* know Stellhorn was a co-owner, then he was not treating Miller differently by issuing her the citation, because a citation to Miller was equally a citation for Stellhorn. As a co-owner and partner, Stellhorn was equally liable for the citation. In fact, the Municipal Court ruled that it was legally proper for Nettum to issue the citations to Miller personally, even if she was only a co-owner. The City of Monona Ordinances allow citations to be issued to "every owner of a building, every person in charge of or responsible for or who caused the construction, repair or alteration of any building or structure." Monona City Ord. § 15-1-3(a). The fact that Nettum chose the female owner to *receive* the formal citation is too thin a reed to pursue a sex discrimination claim.[18]

### 3. Alleged Sexual Discrimination Claim by the City Defendants

Plaintiff attempts to prove the City Defendants discriminated against her on the

---

[17] Even if they could avoid this dilemma, plaintiffs have no admissible evidence that Nettum knew Stellhorn or Harlan were owners of the properties before he issued the July citations. Plaintiffs cite the email from Ray Norton, but it is inadmissible as to Nettum. *See, supra*, n. 5. Even if admissible, it is from August; it does not describe what "ownership information" they obtained; and there is no evidence Nettum received it. Plaintiffs also assert that the AccessDane website in 2006 listed Miller and Stellhorn as co-owners of 4113 and Harlan as the owner of 4111; moreover, Nettum admitted to using that website. (Plts.' Suppl. PFOF (dkt. #106) ¶¶ 38, 47.) These proposed findings of fact, however, were not adequately supported. The version of the website cited was from July 8, 2012, and plaintiffs offered no evidence to indicate that the content of the website was the same in 2006. At minimum then, any claim for sexual discrimination based on the first citations would have to be dismissed.

[18] Nettum's counsel also points out that there were several rational reasons to list Miller on the citations: the demolition application listed only Miller as the owner and she was Harlan's registered agent. These facts do not show that Nettum had a non-discriminatory reason, however, because there is no evidence that Nettum *knew* about the applications or agency relationship at the time.

basis of her sex in two ways. First, the Plan Commission rejected her project because its "density" was too high, but approved a similar project with a higher density run by a male developer. Second, the city unlawfully used the citations as pretext to refuse to issue the permits for three years.

### a. Kevin Metcalfe

Plaintiff point to Kevin Metcalfe as a similarly-situated male developer whose Water Crest development the city approved around the same time in 2006. Like Miller's project, Water Crest is a multiple condominium development on Monona Drive and the shore of Lake Monona. The two projects were proposed in the same zoning area within one-half mile of one another.[19] According to plaintiff, she was told her project was being rejected because its "density" was too high, yet Water Crest was approved for four times as many units on a parcel of land only 50% larger than plaintiffs' property.[20]

The parties dispute whether defendants told Miller that the Plan Commission was opposed to her development because of the number of units. Miller testified that she was told the plan was too dense by the planning and community development coordinator, Kachelmeier, before a Plan Commission meeting and by a Plan Commission member, Kathy Thomas, at "all of the meetings that she attended." (S. Miller Dep. (dkt. #62) 18:18-24.) Kachelmeier denies saying the project had too high of a density and the

---

[19] Unlike the motion to dismiss stage, in which plaintiff alleged only the size of the Metcalfe project, at summary judgment plaintiff produced evidence that the projects are sufficiently similar to warrant comparison. The City Defendants' attempts to argue that the two are too dissimilar – due to the setback, size of the units and differences in the development of surrounding blocks – are relevant to the weight a finder of fact would afford the comparator, but do not sufficiently distinguish them for possible comparison.

[20] By "density," Miller is referring to the number of condominium units per acre.

meeting minutes do not reflect any comments by Thomas -- or any other member or city staff person -- that the project's density was too high. It is also undisputed that no one from the city ever suggested that plaintiff reduce the number of units in her plan.

Ultimately, these disputes about density are immaterial. First, the entire Plan Commission considered Miller's plan, not just these two individuals. Plaintiffs do not contend that Kachelmeier and Thomas controlled the Commission. Kachelmeier does not even vote and did not instruct commissioners to reject plaintiffs' project. Moreover, Kachelmeier placed her plan on the agenda every time she submitted it. Even if Kathy Thomas had mentioned density as a reason to reject plaintiffs' project, Thomas had only one vote on the Commission. *See Kabes v. Sch. Dist. of River Falls*, 387 F. Supp. 2d 955, 968 (W.D. Wis. 2005) (plaintiff could not impute opinion of one board member to the entire board and district).

Second, the Plan Commission raised numerous issues with Miller's project, including its setback, sight lines, proximity to the shoreline, height and size relative to the lot and the adjacent park and nearby properties. Plaintiffs made no effort to show that these numerous other issues were pretextual. On the contrary, the evidence establishes that the commission and city staff expended significant effort, attention and time reviewing Miller's plans; and almost every commissioner provided detailed feedback on Miller's plans during the meetings. No reasonable jury could infer that the Plan Commission and the City discriminated against her in this review process because she was a woman, simply because *one of the many problems* identified with her project by one member of the commission and one staff person was not consistent with the treatment of

another development run by a man.

While Water Crest may be analogous for comparison as to a putative density issue, Metcalfe is not so similarly situated a developer for plaintiffs' claim that the City's decision to withhold permits was prompted by a discriminatory motive. Instead, that decision was occasioned by plaintiffs' demolition and the citations, and Metcalfe's Water Crest project had no similar demolition or citations.

**b. Three-year hold**

Last, plaintiff argues that a jury might infer that defendants Kachelmeier or Kahl discriminated against Miller because they unlawfully used the citations to refuse to issue zoning permits. It is undisputed that mayor Kahl told Kachelmeier that he could review plans, but that no zoning permits would be granted until all outstanding fines and citations were resolved, and that Kachelmeier relayed that information to Miller's attorney. Although plaintiffs do not know whether the City of Monona has taken the same position with other developers, they argue that this procedure deviated from the standard procedure and was unlawful, which may be used to infer discrimination.

As an initial matter, the city denies that the hold on permits was inconsistent with state law. Plaintiff argues it violated Wis. Stat. § 66.0115(1), which provides that

> [A]ny municipality may refuse to issue any license or permit to a person who has not paid an overdue forfeiture resulting from a violation of an ordinance of the municipality. . . . No municipality may refuse to issue a license or permit to a person who is appealing the imposition of a forfeiture.

Plaintiffs' assert that they were "appealing" the citations to the municipal court. Defendants respond that Wis. Stat. § 66.0115(1) is inapplicable, as plaintiffs did not

have an *overdue* forfeiture and plaintiffs were not *appealing* any forfeitures, because no fines had been imposed yet. The City Defendants appear to be arguing that this provision (1) authorizes the City to refuse to issue a license after a person is late paying a forfeiture; (2) prohibits it from refusing licenses while a person is appealing a guilty verdict imposing a forfeiture; and, (3) is silent and irrelevant for all other purposes. Therefore, they could refuse to issue zoning permits while plaintiff was fighting the citations in municipal court, although no fine was due.

Contrary to the City's argument, this provision, like its surrounding provisions, is a grant of power. *Safe Way Motor Coach Co. v. City of Two Rivers*, 256 Wis. 35, 43, 39 N.W.2d 847, 852 (1949) ("The city is a municipal corporation and likewise an agency of the state and possessed of such powers as have been conferred upon it by the constitution or legislative enactment."). The natural implication is that, where the statute is silent, a city does not have the authority to refuse a license. If a city had an unspecified power to deny permits whenever a person has unpaid citations – including while the citation is challenged in court – then there would be no need for the first sentence authorizing the city to withhold permits for delinquent forfeitures.

Nevertheless, the city's deviation from the standard procedure does not imply that the city discriminated against Miller *on the basis of her sex*. It is unclear why Kahl or city staff adopted this position. As described above with respect to defendant Nettum, it is not enough for plaintiffs to prove that the city acted irrationally or even unfairly – they must prove the city treated Miller differently because of her gender. Plaintiffs have not identified any male developers (or any other developers, for that matter) who received

citations but were allowed permits. That was her burden. Without such evidence, a jury would have to engage in pure speculation to infer that the city withheld plaintiffs' permits because Miller was a female developer.

ORDER

IT IS ORDERED that

1) The motion to dismiss (dkt. #93) filed by plaintiffs Harlan, Stephanie Miller and James Stellhorn is GRANTED and all remaining claims against defendant Tony Fockler are DIMISSED with prejudice.

2) The motion for summary judgment (dkt. #65) filed by defendants City of Monona, Paul Kachelmeier and Robb Kahl is GRANTED.

3) Defendant Mark Davis' motion for summary judgment (dkt. #71) is GRANTED IN PART insofar as plaintiffs' equal protection claim against Davis and Fourth Amendment claims based on any search other than the July 7, 2006 search are DIMISSED; the motion is DENIED in all other respects.

4) The motion for summary judgment (dkt. #76) filed by defendants Tony Fockler and David Nettum is GRANTED.

5) The Clerk of Court and the parties shall remove defendant Independent Inspections, Ltd. in all captions for this case going forward in this court.

Entered this 28th day of December, 2012.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge